UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Enrique Cortez,                                    File No. 22-cv-1552 (ECT/JFD)

      Plaintiff,

v.                                                 **OPINION AND ORDER**

General Mills, Inc., and General Mills, Inc.
Long-Term Disability Income Plan,

      Defendants.

---

Robert J. Leighton, Jr. and Denise Yegge Tataryn, Nolan Thompson Leighton & Tataryn PLC, Hopkins, MN, and Jodell M. Galman, Galman Law Offices, Hugo, MN, for Plaintiff Enrique Cortez.

Andrew J. Holly and Ashley C. Repp, Dorsey & Whitney LLP, Minneapolis, MN, for Defendants General Mills, Inc. and General Mills, Inc. Long-Term Disability Income Plan.

---

In this ERISA lawsuit, Plaintiff Enrique Cortez seeks to recover long-term disability benefits under an employee welfare benefit plan (the "Plan") sponsored and administered by his former employer, General Mills. Mr. Cortez applied for benefits in 2017, and his claim was approved. In May 2021, after paying benefits for roughly four years, the Plan determined that Mr. Cortez was no longer disabled and terminated his benefits. In line with the Plan's administrative procedures, Mr. Cortez appealed the decision to terminate his benefits. An appeal committee affirmed the initial termination decision, prompting Mr. Cortez to file this case.

Mr. Cortez and Defendants have filed competing motions seeking judgment on the administrative record pursuant to Federal Rules of Civil Procedure 39(b) and 52(a)(1). In

doing so, the parties have made clear that they wish the Court to exercise its factfinding function and enter judgment on the basis of the administrative record and briefs filed in connection with the motions. Judgment will be entered for Defendants because substantial evidence supported the decision to terminate Mr. Cortez's long-term disability benefits.

I[1]

*The Plan provides benefits to covered General Mills employees who suffer a "Total Disability."* AR 5.[2] As relevant here, a covered employee suffers a "Total Disability" when, after exhaustion of company-provided short-term disability benefits or six months of state-provided disability benefits, the employee is unable to perform the "Essential Functions of his or her Own Occupation . . . and . . . is unable to earn 80% or more of his . . . pre-disability monthly base earnings." AR 9. "Essential Functions" are duties that are "substantial, not incidental, . . . fundamental to the occupation and cannot be reasonably omitted or changed." AR 7. "Own Occupation" includes the employee's "occupation or any reasonably related occupation as it is recognized in the general workplace." AR 8. After an employee has received 18 months of long-term disability benefits, the Plan requires the employee to be not merely disabled from his "Own Occupation," but also to

---

[1] This opinion describes the factual findings and legal conclusions required by Rule 52(a)(1). Citations to the administrative record (or "AR") are to CM/ECF pagination found in the upper right corner (and not to a document's original pagination or to Bates labels assigned during the case).

[2] The Plan document in the administrative record has an effective date of March 1, 2019. AR 2. The parties agree that "the Court can consider the 2019 Plan document to be the operative plan document with respect to Plaintiff's disability claim." ECF No. 51; *see* ECF No. 52.

be "unable to perform, for income, the Essential Functions of Any Occupation, and . . . unable to earn 60% or more of his . . . pre-disability monthly base earnings." AR 9. "Any Occupation" means "an occupation for which the [employee] is reasonably suited, or could become suited, by the [employee's] education, training or experience with or without reasonable accommodations." AR 6. The "Long-Term Disability Committee" (or "Committee") administers the Plan and possesses responsibility and discretion to interpret the Plan and determine benefits claims. *See* AR 6, 13, 21, 29–30. A "Claims Appeal Committee" (or "Appeal Committee") possesses final responsibility and discretion to review appeals by claimants whose benefits claims have been denied. AR 6, 22–24, 30.

*March 2017 – June 2017: The Committee approves Mr. Cortez's initial benefit claim.*[3] Mr. Cortez filed his claim for long-term disability benefits in March 2017. AR 717–18. He claimed to have been unable to work beginning October 13, 2016. AR 717. In response to a question on the Plan's standard claim form asking Mr. Cortez to describe his disabling symptoms, Mr. Cortez wrote: "Radiating back pain & neuropathy down legs, Achilles tendinopathy & major depressive disorder, plus more than a dozen prescription medications + side effects." AR 717. The combination, he wrote, was "physically & mentally crippling." AR 717. At the time of his claim, Mr. Cortez was working for General Mills as an engineer in a research-and-development area. AR 721. In a letter dated April

---

[3]     An "LTD Case Specialist" with a third-party benefits administrator, Sedgwick, coordinated the day-to-day administration of Mr. Cortez's claim and made recommendations to the Committee regarding various matters, including investigative steps and benefits decisions. *See* AR 735–36, 746 (identifying Kim Finley with Sedgwick as the "Disability Representative" assigned to Mr. Cortez's claim). No one suggests that Sedgwick must or should be a party to this case.

19, 2017, the Committee notified Mr. Cortez of its decision to approve his claim, but only through June 30, 2017.  AR 735–36.  The Committee explained—as it would again in several subsequent letters—that it would review Mr. Cortez's eligibility for benefits at regular intervals and that Mr. Cortez's failure to provide periodically updated medical information might result in the suspension of his benefits.  AR 735.

*June 2017 – September 2019: The Committee periodically reviews and approves Mr. Cortez's claim based on records from his treating providers.*  The record shows that Mr. Cortez's claim fell into something of a pattern from June 2017 to September 2019. The Committee periodically reviewed Mr. Cortez's ongoing eligibility for benefits.  *See* AR 743–747 (June 2017 review); 787–98 (September 2017 review); 805–11 (December 2017 review); 823–30 (May 2018 review); 854–65 (September 2018 review); 875–81 (March 2019 review).  The Committee obtained and reviewed medical and treatment records from, and forms completed by, Mr. Cortez's various health-care providers.  *See, e.g.*, AR 753–65 (treatment records); 766–67 (attending physician statement).  During this period, the Committee repeatedly approved Mr. Cortez's claim through a date between roughly ninety days and six months out from its approval decision.  *See* AR 744, 788, 806, 824, 855, 876.

*September 2019 – February 2020: Though two non-treating providers determine that Mr. Cortez can return to work, the Committee approves Mr. Cortez's ongoing claim.* As part of its September 2019 review, the Committee arranged for Mr. Cortez to be examined by two non-treating providers—a psychologist and an orthopedic surgeon.  AR 897.  The Committee approved Mr. Cortez's claim through December 2019 as it awaited

reports from these examinations.  In a report dated November 19, 2019, the psychologist, Mary Kenning, Ph.D., opined that Mr. Cortez's depression symptoms "seem[ed] to be in substantial remission."  AR 909, 915.  She opined "that part[-]time work, up to half[-]time, seems reasonable" and that Mr. Cortez "seem[ed] ready to return to work in the next six weeks."  AR 916.  In a report dated November 27, 2019, the orthopedic surgeon, Paul T. Wicklund, M.D., opined that Mr. Cortez was "not disabled from his present job or any job" and that, "[f]rom an orthopedic standpoint, Mr. Cortez [was] capable of working full-time."  AR 920, 924.  In December 2019, the Committee approved Mr. Cortez's claim through January 2020 to give his treating physicians time to respond to the reports of Dr. Kenning and Dr. Wicklund.  AR 927.  In late December, Mr. Cortez's mental-health-care providers confirmed they agreed with Dr. Kenning's evaluation and recommendations.  AR 936–37.  As of mid-January 2020, the providers who treated Mr. Cortez's physical problems evidently had not responded, AR 939–40, though Mr. Cortez and his spouse had expressed concerns regarding Dr. Wicklund's report, AR 942–43.  Notwithstanding the Sedgwick staff person's recommendation that Mr. Cortez's benefits be terminated effective February 1, 2020, the Committee decided to approve benefits through February 29, 2020, "to await further medical."  AR 940.

*February 2020 – April 2021: The Committee approves Mr. Cortez's ongoing claim.*  During this period, the Committee made a series of decisions approving Mr. Cortez's benefits claim.  All but one of these decisions approved benefits going forward one month at a time; the exception was the Committee's decision in November 2020 to approve benefits through January 2021.  *See* AR 948 (February 2020); 954 (March 2020); 962

(April 2020); 976 (May 2020); 982 (June 2020); 991 (July 2020); 1007 (August 2020); 1022 (September 2020); 1030 (October 2020); 1083 (November 2020); 1098 (January 2021); 1111 (February 2021); 1268 (April 2021).  Several events during this period hold particular significance to this case:

- In April and May 2020, the Committee requested and received completed "Attending Physician Statement" forms from two of Mr. Cortez's treating providers.  A psychiatric provider, physician assistant Leah Streitman, indicated that Mr. Cortez was not able to return to work, but she also noted her agreement with Dr. Kenning's November 2019 recommendations to the effect that Mr. Cortez possessed the ability to return to work at least part-time.  *See* AR 964–65; *see also* AR 937.  An internal medicine physician, David Macomber, M.D., indicated that Mr. Cortez was not able to return to work.  AR 969–70.

- Beginning in February 2020, the Committee's approval of Mr. Cortez's claim was accompanied by a decision to investigate the availability of part-time work.  AR 948.[4]  As far as the record shows, the availability of

---

[4]      As it appears in the record, the description of this decision reads: "Agreement to approve benefits through 03/31/2020 and verbal warning regarding lack of medical documentation.  GMI to reach out to ER regarding potential rtw role."  AR 948.  To be clear, I understand "GMI" to mean "General Mills, Inc."  At the hearing on these motions, Defendants' counsel suggested that "ER" likely meant either "employer" or General Mills' human resources department.  I understand "rtw" to be shorthand for "return to work."  Regardless, the record shows beyond dispute that the Committee's February 2020 approval came with the expectation that Mr. Cortez's possible return to part-time work would be explored.

part-time work remained the subject of inquiry through the Committee's June 2020 benefits decision.  At that time, though the Committee recognized the value a "staged return to work" might hold for Mr. Cortez, it also realized that any income Mr. Cortez might earn from part-time work likely would not impact his Plan benefits.  AR 982.  The subject of part-time work appears to have dropped off the table at that time.

- Effective July 1, 2020, the Committee determined that Mr. Cortez remained disabled and benefits-eligible only because of a mental illness.  AR 982, 986–88.  The basis for this determination is not obvious, but it seems the Committee accepted Dr. Wicklund's determination that Mr. Cortez was not disabled from an orthopedic standpoint.  *See* AR 982.  Had the Committee's "disabled by mental illness only" determination held, its effect would have been to cap Mr. Cortez's eligibility for further benefits at 24 months from July 1, 2020.  AR 987.  The determination did not hold, however.  Claim notes show that the mental-health-only eligibility determination was lifted at the Committee's meeting in July 2020.  AR 991.  Again, the basis for this reversal is not clear, but it appears to have stemmed from the fact that Mr. Cortez was continuing to receive care from "pain and back specialists."  AR 991.

- In October 2020, Mr. Cortez underwent a neuropsychological evaluation by Douglas Whiteside, Ph.D., a clinical neuropsychologist.  AR 1086–89.  Mr. Cortez's treating internist, Dr. Macomber, requested the evaluation.  AR

1086.  Dr. Whiteside's examination showed largely normal results, leading Dr. Whiteside to conclude that Mr. Cortez did not suffer from neuropsychological or cognitive deficits.  *See* AR 1086–87.  Dr. Whiteside found evidence that Mr. Cortez suffered from "significant anxiety symptoms" and "acknowledged a history of depression."  AR 1087.  Dr. Whiteside ultimately concluded that Mr. Cortez's "etiology is multifactorial, including his depression/anxiety symptoms, chronic pain, obstructive sleep apnea, and possible medication effects."  AR 1087.

- In January 2021, Ms. Streitman determined that Mr. Cortez was "cleared to work from a mental health standpoint."  AR 1285.  In Ms. Streitman's opinion, Mr. Cortez was capable of returning to work eight hours per day without limitations beginning January 29, 2021.  AR 1285.

*April 2021 – May 2021: The Committee terminates Mr. Cortez's benefits.*  In April 2021, Mr. Cortez was examined by a non-treating neurologist, Beth Ann Staab, M.D.  AR 1281–84.  Prior to the examination, Dr. Staab reviewed Mr. Cortez's "extensive medical records from 2016 through 2021."  AR 1281.  In a note documenting the examination, Dr. Staab summarized Mr. Cortez's last occupation at General Mills, recounted Mr. Cortez's belief that "he is no longer able to work due to constant pain in his neck and back which he feels is distracting" and the "fog" he experiences from "his pain and his medications needed to control his pain," and summarized Mr. Cortez's medical history.  AR 1281–83.  Dr. Staab diagnosed Mr. Cortez as having cervical and lumbar degenerative disc disease, anxiety, depression, obesity, "complaints of difficulty with focus/attention," diabetes, and

"[l]eft ulnar neuropathy across the elbow status post ulnar nerve transposition." AR 1283. She noted that Mr. Cortez's pain was "consistent with the minor degenerative changes noted on imaging." AR 1284. Dr. Staab concluded:

> In my medical opinion, Mr. Cortez is not disabled from his present job as [a] result of his neck and back pain. Mr. Cortez expressed concern regarding cognitive impairment due to chronic pain and medications used to treat chronic pain. Neuropsychometric testing did not show significant impairment which would preclude him from successfully completing his job.

AR 1284. Dr. Staab opined that Mr. Cortez could return to full-time work and that, due to the non-physical nature of his occupation, it would not be necessary to impose restrictions on Mr. Cortez's occupational activities. AR 1284. In a letter dated May 25, 2021, the Committee notified Mr. Cortez of its determination that he was no longer eligible for benefits and that his last day of benefits would be May 31, 2021. *See* AR 1292–94. This decision, the letter explained, was based on Dr. Staab's examination and opinions and the November 2019 examinations conducted by Dr. Kenning and Dr. Wicklund. AR 1292.

*November 2021 – April 2022: Mr. Cortez appeals the Committee's decision to terminate benefits, and the Appeal Committee denies the appeal.* Through counsel, Mr. Cortez submitted his administrative appeal in November 2021. AR 35–36. In his appeal, Mr. Cortez quoted extensively from records supporting his claim. AR 41–47. To summarize, Mr. Cortez argued: (1) that the decision to terminate benefits was incorrect because his conditions had "worsened throughout 2020 and 2021" and that the absence of documented improvements made the Committee's decision comparable to ERISA benefits determinations the Eighth Circuit and federal district courts have found were arbitrary, AR

48–53; (2) that the Committee improperly "cherry-pick[ed] information" to terminate benefits, AR 53; (3) that the Committee failed to account for the cumulative effect of Mr. Cortez's many health problems, AR 55; (4) that the Committee was required to—but did not—attribute weight to Mr. Cortez's subjective complaints, AR 56–58; and (5) that the Committee's decision was at odds with the decision to award Mr. Cortez Social Security disability benefits, AR 58. A screenshot shows—and Defendants do not dispute—that Mr. Cortez's appeal was delivered to the Appeal Committee at a P.O. Box on November 18, 2021. ECF No. 31-1 at 3. In a letter dated March 10, 2022, however, the Appeal Committee claimed not to have received Mr. Cortez's appeal until that day (March 10). AR 37.[5] The Appeal Committee met to review Mr. Cortez's appeal on March 30, 2022, AR 1301, and in a letter dated April 11, it informed Mr. Cortez of its decision to deny his appeal, ECF No. 37-1. In this letter, the Appeal Committee explained it had determined that Mr. Cortez was not disabled by physical or mental-health conditions, that evidence provided by one of Mr. Cortez's treating physicians suggesting that Mr. Cortez was disabled was outweighed by other, stronger evidence, that Mr. Cortez's combination of conditions did not cause him to be disabled, and that his receipt of Social Security disability benefits had no bearing on his claim for Plan benefits. ECF No. 37-1.

---

[5]     In its response brief, General Mills asserts that Mr. "Cortez's appeal was (through no fault of [Mr.] Cortez's) directed to an incorrect mail box at General Mills due to a miscommunication." Defs.' Resp. Mem. [ECF No. 48] at 2 n.1. According to General Mills, after Mr. Cortez inquired about the status of his appeal, "the miscommunication was discovered," and Mr. Cortez resubmitted his appeal. *Id.*

*Mr. Cortez files this case, and the parties file their motions.*  In his complaint, Mr. Cortez asserts a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA"), seeking recovery of "all benefits due under the Plan" pursuant to ERISA's civil enforcement provision, § 1132(a)(1)(B), attorneys' fees pursuant to § 1132(g), and pre-judgment interest.  Compl. [ECF No. 1] at 1 ¶ 1, and at 3 ¶¶ 1–3.  As noted, Mr. Cortez and Defendants have filed competing motions seeking judgment on the administrative record pursuant to Federal Rules of Civil Procedure 39(b) and 52(a)(1).  ECF Nos. 28, 33.  Through the filing of these motions, the parties have made clear that they wish the Court to "exercise its factfinding function . . . to decide the case on the administrative record."  *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021).  In this circumstance, a district court may weigh evidence, make credibility determinations, and make findings on disputed factual questions.  *See id.* at 1024, 1026.

## II

### A

Suits brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are reviewed de novo unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan grants the administrator such discretion, then "review of the administrator's decision is for an abuse of discretion."  *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012)).  Here, there is no question the Plan vests the Committee and the Appeal Committee with discretion to determine

benefits-eligibility questions.  *See* AR 13, 21–22, 29–30.  Ordinarily, the presence of this discretion-granting language is enough to warrant abuse-of-discretion review.

Mr. Cortez argues, however, that abuse-of-discretion review does not apply and that his claim should be reviewed *de novo*.  To support this argument, Mr. Cortez relies on claims-procedures regulations promulgated by the Department of Labor, 29 C.F.R. §§ 2560.503-1(i)(3)(i) and 2560.503-1(l)(2)(i).  *See* Pl.'s Mem. [ECF No. 45] at 30–31.  The first cited regulation—§ 2560.503-1(i)(3)(i)—says that a disability-benefits plan must issue an appeal determination not later than 45 days after it receives a claimant's request for review.  The second cited regulation reads as follows:

> **(2)** *Plans providing disability benefits.*
>
> **(i)** In the case of a claim for disability benefits, if the plan fails to strictly adhere to all the requirements of this section with respect to a claim, the claimant is deemed to have exhausted the administrative remedies available under the plan, except as provided in paragraph (l)(2)(ii) of this section.  Accordingly, the claimant is entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.  If a claimant chooses to pursue remedies under section 502(a) of the Act under such circumstances, the claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary.

29 C.F.R. § 2560.503-1(l)(2)(i).  In Mr. Cortez's view, the Plan's failure to strictly adhere to the 45-day appeal-determination deadline in § 2560.503-1(i)(3)(i) triggers *de novo* review under § 2560.503-1(l)(2)(i).

This is not correct, at least on this case's facts.  A subsequent rule in the same section says that § 2560.503-1(l)(2) applies to disability-benefit claims "filed under a plan *after*

*April 1, 2018*[.]" 29 C.F.R. § 2560.503-1(p)(3) (emphasis added). As several courts have explained, this means § 2560.503-1(l)(2)(i) does not apply if the initial benefit claim was filed before that date; it doesn't matter if the challenged adverse benefit determination occurred after that date. *Zall v. Standard Ins. Co.*, 58 F.4th 284, 292–93 (7th Cir. 2023); *Card v. Principal Life Ins. Co.*, No. 5:15-cv-139-KKC, 2023 WL 5706202, at **8–9 (E.D. Ky. Sept. 5, 2023); *Taylor v. Unum Life Ins. Co. of Am.*, No. 21-cv-331-JWD-EWD, 2023 WL 2766018, at **12–13 (M.D. La. Mar. 31, 2023); *Brewer v. Unum Grp. Corp.*, 622 F. Supp. 3d 1113, 1119, 1122 (N.D. Ala. 2022); *Martin v. Guardian Life Ins. Co. of Am.*, No. 5:20-cv-507-DCR, 2021 WL 2516083, at *2 (E.D. Ky. June 15, 2021); *Bustetter v. Standard Ins. Co.*, 529 F. Supp. 3d 693, 702 n.3 (E.D. Ky. 2021); *Smith v. Hartford Life and Accident Ins. Co.*, 421 F. Supp. 3d 416, 418–20 (E.D. Ky. 2019); *see Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998, 1003 n.3 (7th Cir. 2019) (Barrett, J.). Here, as noted, Mr. Cortez filed his long-term-disability-benefit claim in March 2017. AR 717–18. Therefore, § 2560.503-1(l)(2)(i) does not apply to trigger *de novo* review in this case.

Under the applicable 2002 regulations, the Eighth Circuit has made clear that "the administrator's decisional delay on appeal does not in and of itself trigger *de novo* review." *McIntyre v. Reliance Standard Life Ins. Co.*, 972 F.3d 955, 964–65 (8th Cir. 2020). In *McIntyre*, the court acknowledged that other circuits permitted *de novo* review of ERISA benefits denials "in the face of an administrator's 'decisional delay' beyond the deadline prescribed in ERISA's implementing regulations of the plan itself." *Id.* at 963 (footnote omitted). The court explained:

13

Such a rule, however, is not the law of our circuit. Consider *Johnson* [*v. United of Omaha Life Ins*, 775 F.3d 983 (8th Cir. 2014)], in which the district court found procedural irregularities present and concluded (mistakenly . . .) that *de novo* review thus was warranted under *Woo*. 775 F.3d at 988. As relevant here, one of the procedural irregularities was the administrator's "failure to timely process the [beneficiary's] claims." *Id.* (brackets omitted). Specifically, the beneficiary appealed the initial denial of her long-term disability claim on August 27, 2010. *See Johnson v. United of Omaha Life Ins.*, No. 8:11CV296, 2013 WL 942511, at *9-10 (D. Neb. Mar. 11, 2013). The administrator denied the appeal on January 28, 2011, meaning the appeal was pending for 154 days. *See id.* at *11. Under both the terms of the policy at issue there as well as the governing regulations at the time, the administrator was required to issue a decision within forty-five days of receipt of the appeal, with only one forty-five-day extension of that initial forty-five-day period permitted, for a maximum total of ninety days. *See* 29 C.F.R. § 2560.503-1(i)(1)(i) (2009); *id.* § 2560.503-1(i)(3)(i). Tolling of this deadline was permitted in limited circumstances, *see id.* § 2560.503-1(i)(4), but it does not appear the administrator in *Johnson* had any basis to argue for tolling, *see Johnson*, 2013 WL 942511, at *10-11. Thus, just like Reliance here, the administrator in *Johnson* failed to issue a decision regarding the appeal within the prescribed timeframe. This untimeliness (and a number of other procedural irregularities) notwithstanding, we reversed the district court and "determined the abuse-of-discretion standard was the appropriate standard for the district court to apply." *Johnson*, 775 F.3d at 988-89.

*Id.* at 964 (footnote omitted). The court explained that "under circuit law, *de novo* review is not triggered in this context unless the administrator wholly fails to act on an appeal and that failure raises serious doubts about the result reached by the plan administrator in its initial denial." *Id.* at 965 (cleaned up). "Deciding an appeal after a prescribed deadline is obviously not a wholesale failure to act on an appeal." *Id.* The Eighth Circuit reaffirmed these principles in a successive appeal in *McIntyre*. *McIntyre v. Reliance Standard Life*

*Ins. Co.*, 73 F.4th 993, 1002–03 (8th Cir. 2023).  In light of the *McIntyre* decisions and other controlling Eighth Circuit cases, it would be a mistake to review Mr. Cortez's claim *de novo*.

B

1

The Eighth Circuit applies two distinct tests to determine whether an ERISA plan administrator's benefits determination was reasonable and not an abuse of discretion. *First*, to determine whether an administrator's interpretation of plan terms was reasonable, the court applies the five-factor test from *Finley v. Special Agents Mutual Benefit Association*, 957 F.2d 617, 621 (8th Cir. 1992).  *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc); *see also id.* at 1014 (Gruender, J., dissenting). The five factors to be considered ask whether the administrator's interpretation: (1) is consistent with the goals of the plan; (2) renders any language of the plan meaningless or internally inconsistent; (3) conflicts with ERISA; (4) is consistent with the administrator's prior determinations regarding the terms at issue; and (5) is contrary to the clear language of the plan.  *Peterson ex rel. E v. UnitedHealth Grp. Inc.*, 913 F.3d 769, 775–76 (8th Cir. 2019).  "While these non-exhaustive factors 'inform our analysis,' the ultimate question remains whether the plan interpretation is reasonable."  *Id.* at 776 (quoting *King*, 414 F.3d at 999).

*Second*, to determine whether an administrator reasonably applied its interpretation to the facts of any particular case, the test is whether the decision is "supported by substantial evidence."  *Johnston*, 916 F.3d at 714 (quoting *Green v. Union Sec. Ins. Co.*,

15

646 F.3d 1042, 1050 (8th Cir. 2011)). "Substantial evidence is more than a scintilla but less than a preponderance." *Id.* (quoting *Green*, 646 F.3d at 1050); *see also Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547–48 (8th Cir. 2017) (citations omitted) (same).

Other considerations are relevant to both tests. "If an administrator also funds the benefits it administers . . . the district court 'should consider that conflict as a factor' in determining whether the administrator abused its discretion." *Jones*, 856 F.3d at 548 (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 718 (8th Cir. 2014)). "A decision supported by a reasonable explanation . . . should not be disturbed, even though a different reasonable interpretation could have been made." *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 832–33 (8th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted), *as corrected* (July 15, 2014); *see also Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014) ("We must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." (citation and internal quotation marks omitted)). "[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *Waldoch*, 757 F.3d at 829–30 (citation and internal quotation marks omitted). "Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision, and not the 'initial, often succinct denial letters,' in order to ensure the development of a complete record." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (citing *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770–71 (8th Cir. 2001); *Wert v. Liberty Life Assurance Co. of Boston*, 447 F.3d 1060, 1066 (8th Cir. 2006)).

16

2

Here, resolving the parties' motions requires applying just the second test.  Though Defendants argue that they are entitled to judgment under the first test and its *Finley* factors, Defs.' Mem. [ECF No. 46] at 21–23, neither Mr. Cortez nor Defendants identify a disputed Plan interpretation, and Mr. Cortez's arguments seem clearly and exclusively directed toward showing that the decision to terminate his benefits lacked substantial evidentiary support, *see* Pl.'s Mem. at 22–30, 36–39.  The issue, then, is whether the decision to terminate Mr. Cortez's benefits was supported by substantial evidence.

Substantial evidence supported the Appeal Committee's determination that Mr. Cortez was not totally disabled due to a mental-health condition or conditions.  *See* ECF No. 37-1 at 5–7.  (a) In January 2021, Mr. Cortez's treating provider, Ms. Streitman, concluded that Mr. Cortez was "cleared to work from a mental health standpoint."  AR 1285.  Ms. Streitman determined specifically that Mr. Cortez could return to work eight hours per day without limitation beginning January 29, 2021.  AR 1285.  It is difficult to imagine stronger evidence.  (b) Dr. Whiteside's neuropsychological evaluation is better understood to support Ms. Streitman's conclusion.  Dr. Whiteside evaluated several aspects of Mr. Cortez's neuropsychological functioning.  AR 1086–87.  These included Mr. Cortez's "attention/concentration," "verbal memory functioning," "[e]xpressive and receptive language," and "executive" functioning.  AR 1086–87.  Generally, Dr. Whiteside measured each of these aspects to be "within expected limits."  AR 1086.  Dr. Whiteside noted that Mr. Cortez's verbal memory functioning and executive functioning were only "very" mildly variable or "mildly variable."  AR 1086–87.  Though Dr. Whiteside

acknowledged that Mr. Cortez suffered from depression, anxiety, and chronic pain, among other health issues, AR 1087, he nowhere expressed the opinion that Mr. Cortez was disabled by a mental-health-related condition. AR 1087–89. To the contrary, several of Dr. Whiteside's recommendations concern Mr. Cortez's behavior in a work environment, permitting the reasonable inference that Dr. Whiteside more likely believed that Mr. Cortez was capable of working. AR 1088–89 (referring to a "clutter-free work environment," a "quiet work environment," and a tendency to procrastinate because Mr. Cortez considers a "task . . . to be overwhelming"). (c) Though her examination occurred roughly eighteen months before the Appeal Committee's decision, Dr. Kenning's opinions also may reasonably be understood to support Ms. Streitman's conclusion. As of November 2019, Dr. Kenning thought that Mr. Cortez was capable of working "up to half[-]time" and that he should be ready "to return to work in the next six weeks." AR 916. Ms. Streitman agreed with Dr. Kenning's opinions at that time, AR 937, and Ms. Streitman's subsequent conclusion that Mr. Cortez was not disabled by a mental-health condition aligns with Dr. Kenning's prediction that Mr. Cortez should be capable of returning to full-time work in the near future.[6]

---

[6]      Defendants argue that "although the Appeal Committee did not reach this issue, it is worth noting that [Mr.] Cortez has exhausted his right to any continuing LTD benefits based upon his mental illness." Defs.' Resp. Mem. at 7. Not so. The Plan caps benefits at 24 months for a beneficiary whose disability is "primarily due to Mental Illness." AR 16. True, the Committee determined that Mr. Cortez remained disabled and benefits-eligible due only to a mental illness effective July 1, 2020. AR 982, 986–88. But the Committee reversed that determination less than one month later at its July 2020 meeting. AR 991. In other words, as far as the Committee was concerned, Mr. Cortez remained benefits-eligible for nearly the entire period he received benefits due to mental illness *and* a physical condition. The Appeal Committee's silence regarding the issue thus

Substantial evidence also supported the Appeal Committee's determination that Mr. Cortez was not disabled by a physical condition. (a) Dr. Staab's examination provides the strongest support. The tests Dr. Staab conducted during her examination returned normal results. AR 1282–83. Her description of Mr. Cortez's medical history and complaints is reasonably thorough, seemingly accurate, and faithful to Mr. Cortez's medical history. AR 1281–83. Dr. Staab's review of Mr. Cortez's past imaging results showed "minor degenerative changes." AR 1284. And Dr. Staab concluded that Mr. Cortez's symptoms were consistent with these changes. AR 1284. Dr. Staab found that neck and back pain did not disable Mr. Cortez from performing his own occupation at General Mills on a full-time basis. AR 1284. Though Mr. Cortez had expressed concern to Dr. Staab regarding his "cognitive impairment due to chronic pain and medications used to treat chronic pain[,]" Dr. Staab explained that "[n]europsychometric testing did not show significant impairment which would preclude him from successfully completing his job." AR 1284. And Dr. Staab concluded that Mr. Cortez's neck and back pain did not warrant restrictions because, as Mr. Cortez described it, his job was not physical and did "not require significant bending, twisting or lifting." AR 1284. (b) The physician who had primary responsibility for treating Mr. Cortez's physical complaints, Dr. Macomber, did not provide the Committee or Appeal Committee with evidence undermining Dr. Staab's conclusions and did not fairly respond to the Committee's requests for information. At times, Dr. Macomber did not opine that neck or back pain caused Mr. Cortez to be disabled.

---

makes perfect sense. Even if it were correct, Defendants' assertion would amount to a not-to-be-considered "*post hoc* rationale[]." *Waldoch*, 757 F.3d at 830.

In an attending-physician-statement form he completed in August 2020, for example, Dr. Macomber listed only "depression" and "headaches" as Mr. Cortez's disabling conditions. AR 998.  Consistent with this form, in a record documenting an office visit on August 4, 2020, Dr. Macomber noted Mr. Cortez's report that "his lower back complaints are stable." AR 1229.  In an attending physician statement dated December 6, 2020, Dr. Macomber identified only "Anxiety" as Mr. Cortez's disabling condition.  AR 1093; *see also* AR 969 (listing "Depression" and "Headaches" as Mr. Cortez's disabling conditions).  Other times, Dr. Macomber did not respond or fairly answer requests for relevant information.  The record includes, for example, no information showing that Dr. Macomber took issue with Dr. Staab's opinions.  And when asked to provide particular information regarding Mr. Cortez's work limitations and restrictions, Dr. Macomber declined.  AR 1095.  Rather than answer a series of specific questions, Dr. Macomber wrote only "Not yet."  AR 1095; *see also* AR 971 (declining to answer the same questions).

Finally, substantial evidence supported the Appeal Committee's determination that Mr. Cortez was not "unable to earn 60% or more of his . . . pre-disability monthly base earnings."  AR 9; *see* ECF No. 37-1 at 10.  Ms. Streitman and Dr. Staab determined that Mr. Cortez was capable of returning to full-time work in his own occupation.  AR 1284–85.  From these conclusions alone, it logically follows that Mr. Cortez was able to earn more than 60% of his pre-disability earnings.  The Appeal Committee's recognition that Mr.

Cortez possesses "impressive academic credentials and work experience," though not necessary, adds support for the conclusion.  ECF No. 37-1 at 10.[7]

3

Mr. Cortez advances several arguments to show that the Appeal Committee's decision was flawed, but none of these arguments are persuasive.

(a) Mr. Cortez's opening brief includes many excerpts from medical records describing his health problems.  Pl.'s Mem. at 4–20.  These excerpts support Mr. Cortez's claim.  On abuse-of-discretion review, however, the fact that the administrative record includes evidence supporting Mr. Cortez's claim—even evidence on which a reasonable administrator might have approved the claim—does not show an abuse of discretion. *Waldoch*, 757 F.3d at 832–33.  It would be different if these excerpts undermined the substantiality of the evidence on which the Appeal Committee based its decision.  But Mr. Cortez does not explain, and it is not apparent, how these excerpts might carry that burden.

(b) Mr. Cortez criticizes the Appeal Committee's reliance on Dr. Wicklund's November 2019 examination.  Mr. Cortez points out that the Plan continued to pay benefits for roughly eighteen months after Dr. Wicklund's examination and report.  Pl.'s Mem. at 22–23 ("Defendants have not made it clear how an [examination] in 2019 is relevant to [Mr.] Cortez'[s] conditions in May of 2021.").  Mr. Cortez criticizes Dr. Wicklund for ignoring objective evidence, including imaging, that supported his complaints of pain. *Id.*

---

[7]     Relevant to this issue, the Plan authorized the Committee and Appeal Committee to "make reasonable estimates and determinations when determining whether the earnings thresholds . . . have been exceeded" and made clear that "absolute precision shall not be required."  AR 10.

at 23.  And Mr. Cortez faults the Committee for failing to ask Dr. Wicklund to address his "co-morbid conditions" more broadly.  *Id.*  Mr. Cortez has a point.  Dr. Wicklund's examination and report do not contribute much.  Dr. Wicklund seems not to have questioned whether Mr. Cortez suffered from his assertedly disabling conditions; he noted specifically that Mr. Cortez suffered from "degenerative disk disease" and "[m]ajor depressive disorder," AR 923, and he recognized that Mr. Cortez "has multiple medical problems which need to be dealt with[,]" AR 924.  Dr. Wicklund appears merely to have concluded that Mr. Cortez's physical problems were not "orthopedic" in nature.  He noted, for example, that Mr. Cortez's "current treatment plan is medically-based and not orthopedically-based."  AR 924.  He agreed that the treatment plan was "appropriate but unrelated to any ongoing orthopedic injury."  AR 924.  In other words, Dr. Wicklund's finding that Mr. Cortez was then capable of working full-time "[f]rom an orthopedic standpoint" appears quite narrow.

(c) Mr. Cortez faults the Appeal Committee's decision for contradicting the opinion of the Plan's retained medical consultant, Paul Anderson, M.D.  Pl.'s Mem. at 28 ("**Defendants' Own Expert Opines that Cortez Cannot Perform His Own Occupation.**").  Dr. Anderson served as a consultant to the Appeal Committee; he had no vote on the Appeal Committee's decision to terminate Mr. Cortez's benefits.  ECF 31-1 at 18 ¶ 4.  Dr. Anderson described his work in connection with Mr. Cortez's claim in a declaration:

> Prior to the hearing on Mr. Cortez's claim, I was provided a copy of the administrative record, and I reviewed the medical opinions of the various physicians included in the file

consistent with my training and expertise. During the hearing on Mr. Cortez's appeal, I noted that I had reviewed the medical reports generated by the various physicians in the record concluding that Mr. Cortez's medical situation did not preclude him from performing the essential duties of any occupation. I informed the Appeal Committee that I found the reports to be comprehensive, that the physicians' credentials appeared to be appropriate for the reports they were providing. I likewise responded to questions about the effect that certain medications that Mr. Cortez was taking, opining that they might affect him in the performance of his own occupation, but they would not preclude him from performing the essential functions of any occupation. I noted that the level of activity reflected in the record was not consistent with his claims that he was totally disabled. I also explained the nature of the cognitive tests in the record and concluded that they did not reflect the profound level of disability claimed by Mr. Cortez. To the contrary, they suggested that [he] had the ability to function and had relatively strong cognitive capacity. I concluded based upon my review of the records, Mr. Cortez's medical situation did not preclude him from performing the essential functions of any occupation.

ECF No. 31-1 at 18–19 ¶ 5. Dr. Anderson's testimony and conclusions do not help Mr. Cortez. Dr. Anderson found that Mr. Cortez was not disabled. It is true that Dr. Anderson's conclusion differed from the Appeal Committee's in that he found Mr. Cortez could perform the essential functions of any occupation, where the Appeal Committee determined Mr. Cortez could perform his own occupation. Regardless, had the Appeal Committee accepted this conclusion, it is difficult to understand how it might have reached a decision to approve Mr. Cortez's claim. Mr. Cortez does not address this question. Perhaps recognizing that Dr. Anderson's testimony does not help him, Mr. Cortez also disputes the reasonableness of Dr. Anderson's conclusions. Mr. Cortez argues that Dr. Anderson's finding that Mr. Cortez's "level of activity reflected in the record was not

consistent with his claims that he was totally disabled" lacks support. Pl.'s Mem. at 29. I disagree. A reasonable person could infer from several record documents that Mr. Cortez engaged in activities that were not consistent with his complaints. *See, e.g.*, AR 1071 ("10 hours to Dallas without substantial break and his neck did fine (14 hours total)."); AR 1224 (noting that Mr. Cortez and his wife were "redoing their deck" and that, "[i]f it weren't for the additional physical work, his pain would be better").

(d) Mr. Cortez argues that there was no change in his medical conditions that might have justified the decision to terminate his benefits. An ERISA plan's decision to pay benefits does not "operate[] forever as an estoppel so that an [administrator] can never change its mind." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002). "[T]he previous payment of benefits is a circumstance that must weigh against the propriety of an [administrator's] decision to discontinue those payments" if there is not significant, new information regarding the participant's health available to the plan. *Id.* Here, the Plan was presented with significant, new information. This included Ms. Streitman's January 2021 determination that, from a mental-health perspective, Mr. Cortez was cleared to work full-time and without restrictions beginning January 29, 2021. AR 1285. It also included Dr. Staab's examination and resulting opinions in April 2021 that "Mr. Cortez is not disabled from his present job as [a] result of his neck and back pain" and that "[n]europsychometric testing did not show significant impairment which would preclude him from successfully completing his job[,]" AR 1284. *McOsker* and another case on which Mr. Cortez relies as support for this argument, *Roehr v. Sun Life Assurance Company of Canada*, 21 F.4th 519 (8th Cir. 2021), are distinguishable. The assertedly new

evidence in those cases was insubstantial.  The new evidence in *McOsker* consisted of an ambiguous treatment note suggesting that the participant "could return to work but not at pre-disability level of functioning." 279 F.3d at 589.  The Eighth Circuit characterized this as a "highly ambiguous . . . opinion."  *Id.*  In *Roehr*, the plan insurer "relied on virtually the same medical records for a decade" to justify its decision to pay benefits, and then "used essentially the same records" to justify its decision to terminate benefits.  21 F.4th at 525–26.  Ms. Streitman and Dr. Staab's opinions were unambiguous and new.  They distinguish this case from *McOsker* and *Roehr*.  There is more.  The Plan adjudicated Mr. Cortez's benefits claim through a series of decisions approving benefits for defined periods—usually one month at a time, though occasionally longer.  The Committee's notes often reflect uncertainty regarding what precise conclusions to draw from Mr. Cortez's treating providers' records and a recognition of the need for additional evidence to evaluate the claim.  The Committee's notes also reflect a willingness to pay Mr. Cortez benefits while additional evidence was obtained and Mr. Cortez's treating providers were allowed the opportunity to respond.  In other words, a careful review of the administrative record shows that this is not one of those cases where an administrator unequivocally approved a claim, paid benefits for a comparatively lengthy period, and then changed its mind for an insubstantial reason.  *Cf. Kecso v. Meredith Corp.*, 480 F.3d 849, 854 (8th Cir. 2007) ("[T]he record suggests that Meredith simply agreed to pay LTD benefits to Kecso while it sought to reconcile the conflicting medical information by obtaining all of Kecso's relevant medical records.").

(e) Mr. Cortez argues that the Committee and Appeal Committee acted as his adversary. Pl.'s Mem. at 36.  This argument is not specific and therefore difficult to address with any particularity.  Regardless, the record does not support a factual finding that the Committee or Appeal Committee acted as Mr. Cortez's adversary or otherwise breached its fiduciary duty.  The better reading of the lengthy record is that the investigative steps and decisions taken with respect to Mr. Cortez's claim reflected a genuine effort to fairly adjudicate the claim.   The period between September 2019 and February 2020 is emblematic.  During that time, the Committee received the opinions of Dr. Kenning and Dr. Wicklund along with the Sedgewick staff person's recommendation to terminate Mr. Cortez's benefits effective February 1, 2020.  *See supra* at 4–5.  It seems fair to presume that an adversarial administrator would have accepted this recommendation and terminated benefits at that time, but the Committee did not.  It approved Mr. Cortez's claim through February 29, 2020, to give Mr. Cortez's treating providers a fair opportunity to respond to Dr. Kenning and Dr. Wicklund's reports.  AR 940.  These are not decisions one would expect from an adversary.

(f) Mr. Cortez argues that his receipt of Social Security disability benefits shows that the Appeal Committee's decision to deny his claim for Plan benefits was an abuse of discretion.  "Although the Social Security Administration's determination is not binding, it is admissible evidence to support an ERISA claim for long-term disability benefits." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1027 (8th Cir. 2021) (quoting *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 759 n.4 (8th Cir. 2001)); *see also Waldoch*, 757 F.3d at 833 (noting that that Social Security "disability awards are not binding on ERISA

plan administrators"); *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003) ("[A]n ERISA plan administrator or fiduciary generally is not bound by an SSA determination that a plan participant is disabled, even when the plan's definition of disabled is similar to the definition the SSA applied.") (cleaned up).  Here, Mr. Cortez's reliance on his receipt of Social Security disability benefits does not show that the Appeal Committee abused its discretion.  Begin with the general proposition that, under abuse-of-discretion review, the mere presence of a different or competing determination says relatively little because different decisionmakers might reasonably reach different determinations on the same evidence.  *Waldoch*, 757 F.3d at 832–33.  Mr. Cortez does not explain why or how the Social Security Administration's favorable decision shows an abuse of discretion by the Appeal Committee.  There is another problem.  There is no evidence showing that the Social Security Administration reached its decision based on a review of the same evidence that was before the Appeal Committee.  *See Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir. 2002) ("It is not certain that the SSA still would have concluded that Jackson was entitled to disability benefits had it reviewed the same record that was before MetLife.").  We do not know, for example, whether the Social Security Administration was presented with Ms. Streitman or Dr. Staab's reports or conclusions or other evidence on which the Appeal Committee based its decision.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff Enrique Cortez's Motion for Judgment on the Administrative Record [ECF No. 28] is **DENIED**.

2.      Defendants General Mills, Inc. and General Mills, Inc. Long-Term Disability Income Plan's Motion for Judgment on the Administrative Record [ECF No. 33] is **GRANTED**.

3.      Judgment shall be entered in favor of Defendants General Mills, Inc. and General Mills, Inc. Long-Term Disability Income Plan on the claims of Plaintiff Enrique Cortez under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, with prejudice and on the merits.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: November 13, 2023                         s/ Eric C. Tostrud
                                                                Eric C. Tostrud
                                                                United States District Court